E-FILED
Friday, 27 March, 2026  11:37:26 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LORENZO FORD, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-3192 |
| | ) | |
| ILLINOIS DEPARTMENT OF REVENUE, | ) | |
| Defendant. | ) | |

<u>OPINION</u>

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court are Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment. (Docs. 28, 35). Plaintiff contends his employer violated the Americans with Disabilities Act ("ADA") by not approving his request to work remotely full-time due to his disability.

I.    **BACKGROUND**

A.  **Plaintiff's Efforts to Work Remotely**

Plaintiff Lorenzo Ford was hired in 2016 by the Illinois Department of Revenue ("Department") as a revenue tax trainee and was promoted to a revenue tax specialist in 2017. (Doc. 36 at ¶ 1). Prior to March 2020, Ford performed all his work in the Willard Ice Building. (*Id*. at ¶ 36). Following a March 2020 stay-at-home order issued by the Governor in response to the COVID-19 Pandemic (the "Pandemic"), Ford and his colleagues transitioned from working in-person full-time to a rotational schedule where they were in-office one week and "on call" the next. (*Id*. at ¶¶ 36–37, 39). When the employees were "on call" they did not perform any job duties unless called in to the office to do so. (*Id*. at

¶ 40). Ford was concerned with the Department's in-office Pandemic protocols and states he used vacation time to limit his in-office days during this period. (Doc. 48-1 at ¶ 15(35, 38, 42)).

After the Department required all employees to resume their pre-pandemic schedules, Ford informed his supervisors on July 17, 2020, that he would likely need to take a leave of absence "unless cases started to go down, a remote work area or work from home option is made available." (Doc. 36 at ¶ 44). On July 23, 2020, Ford emailed the Department's Human Resources Department requesting an unlimited leave of absence until the Pandemic was over. (*Id.* at ¶ 45). In August 2020, Ford requested an unpaid, six-month General Leave of Absence because of "the absence of the availability of working from home . . . and due to the coronavirus pandemic, more specifically, out of concern of being exposed to and/or infected with the virus." (*Id.* at ¶ 46). Ford's leave request was approved beginning August 17, 2020, and subsequently extended to August 2021. (*Id.* at ¶¶ 46-47). Ford did not return to work in person after July 2020. (*Id.* at ¶ 48).

On July 9, 2021, Ford submitted a Reasonable Accommodation Request to work exclusively from home and for the Department to provide him with "a state-issued laptop, state-issued mobile internet device, a computer mouse and mousepad, plus any other equipment the State may find appropriate." (*Id.* at ¶¶ 49, 51). The Reasonable Accommodation Request included a Physician's Medical Review by Dr. Avi Viswanathan who diagnosed him with "generalized anxiety disorder" with an expected duration of three months "to ease the stressors associated with exposure to Covid-19 and

allow time to ease into new pandemic regulation." (*Id.* at ¶¶ 52–53). On July 27, 2021, Ford's attorney sent Ford's Reasonable Accommodation Request to David Harris, the Department Director. (Doc. 29-5 at 2).

The Department's ADA Committee held a hearing on the accommodation request wherein Ford testified, and the Committee reviewed the Reasonable Accommodation Request, Physician's Medical Review, and the relevant position description. (Doc. 36 at ¶¶ 57, 59–60). The Committee denied Ford's accommodation request because it was not feasible and outside of the abilities of the work group to accommodate such a request. (Doc. 48 at 16; Doc. 48-4 at 18:1–19). Alternatively, the Department proposed the accommodation of "adding [Ford] to the work from home rotation, and, when not working from home, providing Ford with his own conference room as a private workspace to work in with no other staff present except for training when Ford returned to work; installing a HEPA air filter in Ford's work area, providing Ford with extra masks and a face shield, and allowing Ford to structure his work schedule, in accordance with the flex-time policy, so that he was not arriving and departing at peak times." (Doc. 36 at ¶ 62). Ford rejected the proposed accommodation and appealed his ADA Request to the Chief of Staff on October 11, 2021, stating that his requested accommodation is remote work, and his alternative requested accommodation is reassignment to a job that can be worked remotely. (Doc. 29 at ¶ 17; Doc. 36 at ¶ 64).

On November 12, 2021, the Department's ADA Coordinator notified Ford that he had to either return to work or take a leave of absence. (Doc. 29 at ¶ 18). Ford then

submitted a final appeal to David Harris on January 31, 2022. (*Id.* at ¶ 19). As part of this final appeal, Ford submitted Dr. Terry Killian's lengthy forensic psychiatric evaluation diagnosing him with severe generalized anxiety disorder and "probable panic disorder with severe agoraphobia." (*Id.* at ¶¶ 19–21). According to the evaluation, Ford's anxiety disorder is so severe that he can rarely leave his house. (*Id.* at ¶ 22). Dr. Killian's opinion letter specifically stated "Ford's request for reasonable accommodation appears legitimate and should be granted, assuming that he is correct that all of this work can be completed remotely." (Doc. 48 at ¶ 41). Ford's final appeal was denied, and he has remained on a leave of absence since August 17, 2020. (Doc. 36 at ¶¶ 65–66).

### B. Plaintiff's Job Responsibilities

Within the Department, Ford mainly worked in the Response Section. (*Id.* at ¶¶ 11–12).[1] The Response Section handles state income tax forms and responds to taxpayers if additional information is required. (*Id.* at ¶ 13). Ford was trained to work on three different issues: (1) return correction notices; (2) unknown overpayments; and (3) collections. (Doc. 48 at ¶ 29). Ford and his other Response Section colleagues dealt with physical and electronic tax documents and worked files on a "First In, First Out" basis. (Doc. 36 at ¶¶ 15, 18). The physical inventory is stored in a secure room in the section's office per Department and Internal Revenue Service protocols. (Doc. 36 at ¶ 24).

---

[1] Ford says he was transferred to the Response Section in 2017. Ford was transferred again to a now-defunct section, the Amended Section, in March of 2020, but only worked on files from the Response Section as the Pandemic prevented Ford from receiving the necessary in-house training to do the work specific to his new section. (Doc. 36 at ¶¶ 11–12, 27, 32–34).

While the parties disagree on how much work was done with electronic as opposed to physical documents, there is no dispute that a substantial amount of the Response Section's workload involved processing physical filings stored in its office. For example, Ford's immediate supervisor testified that in 2020, approximately 90 percent of files the Response Section processed were paper. (Doc. 48-3 at 26:8–14). And in 2021, only about one-third of return correction notices could be worked remotely. (Doc. 48 at ¶ 45). Since then, the Department has made a push to use more electronic documents, but the Response Section still works with physical documents stored on-site. (Doc. 48-3 at 19:13 to 20:17). Ford alleges he only worked with electronic documents from August 2019 until the Department closed during the Pandemic. (Doc. 48 at ¶ 33). The Department disputes this assertion and counters that even if true, Ford could have been reassigned to other work, including work involving physical inventory, at any time by his supervisor. (Doc. 29-1 at 32:8–11; Doc. 36 at ¶ 18). As of May of 2025, Response Section employees work remotely three days a week, in-person two days a week, and attend in-house training as needed. (Doc. 36 at ¶ 84). No one in the Response Section is fully remote. (*Id*. at ¶ 85). Before resuming work, Ford would need to receive training on changes to laws, procedures, processes, and technology since August 2020. (*Id*. at ¶ 10).

## II.    DISCUSSION

### A.  Legal Standard

Summary judgment is proper if the movant shows that no genuine dispute exists

as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party. *Carroll v. Lynch,* 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is only material if its resolution might change the suit's outcome under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Woodruff v. Mason,* 542 F.3d 545, 550 (7th Cir. 2008). Summary judgment is not appropriate if a reasonable jury could just as easily return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248. "At summary judgment, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC,* 464 F.3d 659, 664 (7th Cir. 2006) (internal quotation marks omitted). Courts may also rule on partial motions for summary judgment, which is relevant here as Ford seeks partial summary judgment. *See Am. Nurses' Ass'n v. State of Ill.,* 783 F.2d 716, 729 (7th Cir. 1986).

## B. Analysis

"The ADA is designed to prohibit discrimination against employees whose disabilities have no bearing on their ability to perform a given job, but also to ensure employment opportunities for disabled persons who are otherwise qualified for a job, but as a result of a disability are unable [to] perform the job's essential functions without reasonable accommodations." *Brumfield v. City of Chi.,* 735 F.3d 619, 632 (7th Cir. 2013)

(internal quotation marks omitted). Ford argues he was denied reasonable accommodation when the Department refused to let him work virtually full-time.

To succeed on a failure-to-accommodate claim under the ADA, a plaintiff must show: (1) he is a qualified individual with a disability; (2) his employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability. *Id*. at 631 (citation omitted). The Department argues Ford cannot establish that he is a qualified individual with a disability or that the Department failed to reasonably accommodate him. The crux of the parties' disagreement centers on whether the "essential functions" of Ford's position require him to ever work in-person. If they do, Ford—who maintains he cannot work in-person and contends anything but a full-time remote accommodation is unreasonable—has not met the first or third prongs. *See Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010) (explaining a "qualified individual" can "perform the essential functions of the job, with or without reasonable accommodation" (internal quotation marks omitted)); *Equal Emo. Opportunity Comm'n v. Wal-Mart Stores, Inc.*, 38 F.4th 651, 658 (7th Cir. 2022) (finding an accommodation unreasonable when it creates "an inability to do the job's essential tasks" (internal quotation marks omitted)).

To determine whether a particular duty is essential, courts consider "the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences" ("*Ammons* factors"). *Ammons v. Aramark Uniform*

*Servs., Inc.,* 368 F.3d 809, 818 (7th Cir. 2004) (cleaned up) (internal quotation marks omitted); *see also* 29 C.F.R. § 1630.2(n)(3) (listing factors). In the past, in-person attendance was almost certain to be considered an essential function of a job and working from home was automatically assumed to be unreasonable in all but the most extraordinary circumstances. *See Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 644 (7th Cir. 2023) (reviewing older cases). Since the Pandemic, the Seventh Circuit now "assess[es] whether in-person attendance is essential on a context-specific basis." *Smithson v. Austin*, 86 F.4th 815, 823 (7th Cir. 2023). Ford does not direct the Court to any case where full-time virtual work was found to be a reasonable accommodation. In fact, two post-Pandemic cases Ford relied on held the requested work-from-home accommodations were not reasonable. (Doc. 48 at 32) (relying on *Kinney*, 76 F.4th 635; *Brown v. Humana Ins. Co.*, 942 F. Supp. 2d 723, 732 (W.D. Ky. 2013)).

In *Kinney*, a hospital instructed plaintiff Anna Kinney, an executive director and supervisor of imaging services in the radiology department, to work remotely at the onset of the Pandemic along with other employees. 76 F.4th at 640. After Kinney was called back to work, she requested remote work accommodations, contending her anxiety disorder prevented her from wearing face masks, a Pandemic precaution required by the hospital. *Id*. at 640, 643. The Court found that despite Kinney's temporary period of remote work, the essential functions of her position required her to work in-person at times. The Court stated: "The fact that many employees were able to work remotely temporarily when forced to do so by a global health crisis does not mean that those jobs

Page 8 of 15

do not have essential functions that require in-person work over the medium to long term." *Id*. at 644. In reaching its conclusion, the Court considered several of the factors listed in *Ammons* and focused on Kinney's position rather than relying "on generalities about the obvious benefits of physical presence in a workplace." *Id*. This "case-specific inquiry," the Court reasoned, was appropriate considering "[t]he many lessons learned about working from home effectively during the pandemic." *Id*. *Kinney* provides a helpful roadmap for analyzing post-Pandemic remote work requests and establishes that temporary remote work arrangements do not always indicate job responsibilities can be accomplished remotely in perpetuity.

Conducting a "case-specific inquiry" consistent with *Kinney* and considering the factors listed in *Ammons*, the Court finds it is essential for those in Ford's position to go into the office at times. For example, Response Section revenue tax specialists need to be in-person for training and to process physical inventory. The Department is required to adhere to security protocols for taxpayer documents, established in IRS Service Publication 1075, which requires the processing of paper documentation to be completed on site. (Doc. 36 at ¶ 87).  This is consistent with the Department's practice during the Stay-at-Home Order wherein the "on call" employees only performed their duties when they were called into the office. They were not processing documents remotely. Ford's employer's opinion cuts in favor of this finding as the Department and Defendant's supervisor have maintained that working physical inventory of tax documents and attending in-person training are essential to his position. (*E.g.*, Doc. 36 at ¶ 61; Doc. 37-1

at ¶ 20; Doc. 48-3 at 26:8–14). The Court notes that although it "consider[s] and respect[s] an employer's opinion about whether a function is essential, [it] do[es] not give the employer's view complete deference." *Kinney* 76 F.4th at 644. As such, the Court continues to the next *Ammons* factor.

Looking at the time spent performing a function, Ford states that in the months leading up to the Pandemic, he had not worked with physical inventory. But even assuming this contested statement is true, there is no dispute that a substantial amount of his Section's workload involved processing physical inventory. According to Ford's immediate supervisor, approximately 90 percent of files processed by the Response Section in 2020 were paper and in 2021, only about one-third of return correction notices could be worked remotely. (Doc. 48-3 at 26:8–14; Doc. 48 at ¶ 45). This evidence indicates tax revenue specialists spend considerable time in-person dealing with physical inventory.

This analysis connects to another *Ammons* factor: "the consequences for not requiring the individual to perform the duty." *Ammons*, 368 F.3d at 818. A consequence of Ford working fully remote would be his colleagues having to complete in-person work he otherwise is required to perform such as processing the physical files in the office. At the time of his request, the workload and volume of processing electronic documents was insufficient to allow Ford to work on it remotely full-time. Even now with significant technological advances within the Department and Response sections for remote arrangements, no employees are approved to work remotely full-time. Moreover, Ford's

request to work remotely full-time would result in other employees performing additional duties to accommodate his request such as scanning documentation to provide enough work for Plaintiff to work remotely full-time. The Seventh Circuit has frowned on such arrangements, stating that "the mere fact that others could do [a plaintiff's] work does not show that the work is non-essential." *Basith v. Cook County*, 241 F.3d 919, 929 (7th Cir. 2001); *see also Gratzl*, 601 F.3d at 680 (finding an employer has no duty to "create a new job or strip a current job of its principal duties to accommodate a disabled employee").

Furthermore, Ford's requested arrangement would require the Department to violate or modify its operational "First In, First Out" ("FIFO") policy. The Department interprets Illinois law as requiring FIFO processing because it provides taxpayers with timely service and ensures fairness in that all taxpayers are treated in the same manner. (Doc. 36 at ¶ 16); *see* 35 ILCS 5/904 ("As soon as practicable after a return is filed, the Department shall examine it to determine the correct amount of tax."). If physical documents were next in queue and Ford only worked on electronic filings, the files would be worked out of order. In order to accommodate a full-time remote position and honor the FIFO system, the Department would have been required to dedicate an employee to sort, scan, and manually upload scanned paper inventory into the Gentex system so that a Revenue Tax Specialist could access that information on a secure computer. (Doc. 36 at ¶ 23). The Department also holds in-person annual trainings and according to Ford's supervisor, none of the Response Section trainings are remote. (*Id*. at ¶¶ 8–9). Ford

disputes his supervisor's contention that all trainings are in-person but the record shows many trainings are indeed in-person. Therefore, the consequences of permitting Ford to work remotely strongly supports the Department's position that in-person work is essential.[2]

Moving on to the next *Ammons* factor, Ford's job description indicates working in-person is an essential function of his job. It states those in his position must "[l]ift[] and carr[y] tubs of tax documents weighing up to 25 pounds." (Doc. 37-14 at 2). This requirement presumes Ford will be working in-person with physical inventories. Finally, considering "past and current work experiences," although many in Ford's position now have hybrid schedules, none have or ever had the permanent full-time virtual arrangement Ford seeks.[3] *Ammons*, 368 F.3d at 818. Therefore, after considering Ford's employer's opinion, the time Response Section employees spent working with physical inventories, the consequences of allowing Ford to not work in-person, Ford's job description, and past and current work experiences, the Court finds Ford cannot complete the essential functions of his position working remotely full-time.[4] Therefore,

---

[2] The Department also says honoring Ford's 2021 accommodation request would have required it to provide Ford with a work-from-home laptop and other equipment it didn't have or couldn't spare at the time. This point aids the Department's case but is less persuasive because it does not as directly address the essential functions of Ford's job and a reasonable accommodation often includes the "acquisition or modification of equipment or devices." 42 U.S.C. § 12111(9).

[3] Ford contends his brother, who worked for the Department, worked fully remote but does not claim his brother worked in the same position as him. (Doc. 48-1 at 5).

[4] The Department further argues that granting Ford's request would violate its Collective Bargaining Agreement and remote work policies. The Court does not reach those arguments because the Department would still prevail even if the Court sided with Ford on those issues.

Ford fails to meet the first prong of his ADA claim because he is not a "qualified individual." Ford's claim therefore fails.

Finally, the Court finds Ford fails to satisfy the third prong of his failure-to-accommodate claim because the Department offered reasonable accommodations to address his ADA request. A reasonable accommodation is one that "effectively accommodates the disabled employee's limitations." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005); *see also U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) ("An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations.") (emphasis in original). Yet while an accommodation must be "effective," "an employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008).

In *Kinney*, the Seventh Circuit, after concluding the essential functions of Kinney's position included in-person duties, dismissed her remote work request as unreasonable under the ADA. 76 F.4th at 646. Specifically, Kinney requested "to work in person two days a week for six hours each day, but [to] perform[] as many of her responsibilities as possible in her office using remote technology so that mask wearing is kept to a minimum." *Id.* (internal quotation marks omitted). The Court found this request unreasonable "because it would have allowed Kinney to avoid performing tasks essential to her job rather than helped her to accomplish them." *Id.* ("The accommodation [sought]—another person to perform an essential function of the job [plaintiff] wants—

is, as a matter of law, not reasonable." (quoting *Majors v. General Electric Co.*, 714 F.3d 527, 535 (7th Cir. 2013))). The Court then reasoned that given Kinney's request, "no reasonable accommodation would have allowed her to fulfill the in-person duties of her job." *Id*. at 645–46.

Here, the offered accommodations were: "adding [Ford] to the work from home rotation, and, when not working from home, providing Ford with his own conference room as a private workspace to work in with no other staff present except for training when Ford returned to work; installing a HEPA air filter in Ford's work area, providing Ford with extra masks and a face shield, and allowing Ford to structure his work schedule, in accordance with the flex-time policy, so that he was not arriving and departing at peak times." (Doc. 36 at ¶ 62). This accommodation was offered after the ADA Committee heard testimony from Ford and reviewed supporting documentation from his Reasonable Accommodation Request. (*Id*. at ¶¶ 59–62).

Ford's disability is related to his "fear of COVID-19," (Doc. 29 at 8 (quoting Dr. Killian)), and the Department's accommodations were directly responsive to that fear. He would work in his own isolated space socially distanced from others with a schedule that allows him to arrive and leave at non-peak hours. The accommodation provided various forms of protection against the disease and allowed remote work, just not full-time. These accommodations all mitigate, in the words of Dr. Viswanathan, "the stressors associated with exposure to Covid-19." (Doc. 36 at ¶ 53). As described above, Ford's requested accommodation of full-time remote work is unreasonable and it would require him, like

Kinney, to forgo performing the essential in-person functions of his job. Accordingly, Ford fails to meet the third prong of his ADA claim.

## III.    CONCLUSION

For the reasons above, Defendant's Motion for Summary Judgment, (Doc. 35), is GRANTED and Plaintiff's Motion for Partial Summary Judgment is DENIED. (Doc. 28). The Clerk is DIRECTED to enter judgment in favor of Defendant. This case is closed.

ENTER: March 27, 2026

s/*Colleen Lawless*

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE